PIER vs. BULLIS and another.

*January 8 — February 3, 1880.*

PROMISSORY NOTE, *with indorsed assignment, converted by payee, and payment made to a person other than the assignee: Presumptions: Notice.*

The payee of a note delivered it as collateral security, with his written assignment to the pledgee indorsed thereon, and the pledgee afterwards gave temporary possession of the note for a specific purpose to the payee, who thereupon converted it to his own use, by selling it to one W., to whom the makers paid the note, and took it up. In an action by the pledgee against the makers, *Held,*

1. That, defendants refusing to produce the note, on notice, it must be presumed that when they took it up the assignment indorsed remained unerased and uncancelled.

2. That from the note itself, in that condition, both W. and defendants were chargeable with notice of plaintiff's rights as assignee; mere possession of the note in that state by the payee did not raise any legal, presumption of a reassignment to him; the inability of W. to read, or his having in fact overlooked the assignment, would not prevent his being chargeable with notice thereof; the delivery of the note to the payee under such circumstances would not estop the assignee from asserting his ownership; and, in the absence of further evidence, it was error to direct a verdict for the defendants.

APPEAL from the Circuit Court for *Fond du Lac* County. The case is thus stated by Mr. Justice TAYLOR:

" The defendants gave one H. G. Sampson their non-negotiable promissory note for the sum of $275, dated on or about the first of January, 1878, and payable six months after date. On the tenth of January, 1878, Sampson delivered the note to the plaintiff, *Pier*, as collateral security for the payment of his note of $200, given to said *Pier* on that day, and payable three months after date. At the same time he made a written assignment on the back of said non-negotiable note, in the following form:

'For value received, I hereby sell, transfer and assign to *C. K. Pier* the within contract.          H. G. SAMPSON.'

" This note remained in the hands of *Pier* until the twelfth

day of April, 1878. On that day Sampson paid *Pier* $100 on his note for $200, and gave him a new note for $100, payable 90 days after date. This last note remained unpaid at the time of the trial of this action.

" On the same day the following transaction took place between *Pier* and Sampson in regard to the note of *Bullis* and *Robbins:*

" Sampson wanted to sell this note to *Pier*, and he declined buying it. Sampson then said to *Pier*, that if he went on the street he thought he could sell it, and wanted to know if *Pier* was willing to assign it over if he sold it. *Pier* said he was willing to assign as soon as he got his money on the other note. Sampson then wanted *Pier* to take the note over to George Arnold or Mr. Hamilton, or both, to show to them. *Pier* told Sampson he could take it himself, and if they wanted to buy it, they could, and he would make an assignment of it. *Pier* testifies that the arrangement was, in substance, that Sampson should take the note and show it to some men who, Sampson thought, would buy it, and if he could sell, bring it back to him, and he would assign it on being paid the amount of his $100 note. Sampson took the note, and never returned it, but on the same day sold it to one Weyer; and Weyer took it the next day to the makers, *Bullis* and *Robbins*, and they paid him the amount thereof and took it up. Weyer swore that he held the note of Sampson, on which one Branchand was indorser, for $200; that he and Branchand knew that Sampson held the note of *Bullis* and *Robbins*, and were anxious to get that note in exchange for the $200 note he held against Sampson, as *Bullis* had told him if he got their note they would pay him the cash on it. In the purchase of the *Bullis* and *Robbins* note, he gave in exchange Sampson and Branchand's note for $200, and $45 cash; and *Bullis* and *Robbins* paid him the money on the note the next day. Weyer swore that he did not see the assignment on the back of the note until after he had given up his $200 note and paid the

money; that he then saw something on the back of the note, and asked Sampson what it meant; that Sampson said ' he was hard up this winter, and took up a little money on it; that it was all right; that it was paid.' That the plaintiff had demanded the note of the defendants before the commencement of the action, was admitted by the pleadings.

" Upon this evidence, the circuit judge directed the jury to return a verdict for the defendants. The plaintiff duly excepted to the ruling of the court."

From a judgment in favor of the defendants, plaintiff appealed.

For the appellant, there was a brief by *Shepard & Shepard,* and oral argument by *Geo. E. Sutherland:*

1. The appellant, as pledgee, had a special property in the note, and was entitled to possession thereof against every one, subject only to the payment of the debt by Sampson. Story on Bailm., §§ 287, 299, 303, 352; Edwards on Bailm., 211–12; *Macomber v. Parker,* 14 Pick., 497; *Hays v. Riddle,* 1 Sandf. S. C., 248. 2. The note was delivered back to the pledgor under limited authority only, as special bailee or agent. Such delivery neither vested in him any power to sell and deliver, nor justified defendants or others in dealing with him as possessed of such power. Story on Agency, § 299; *Hollins v. Fowler,* 14 Moak, 138, 171, 172, 175; *Stephens v. Elwall,* 4 Maule & Sel., 259. 3. The pledged note was non-negotiable, and defendants were chargeable with notice of plaintiff's title and of the extent of Sampson's authority. *Dows v. National Exchange Bank,* 91 U. S., 618; *Marine Bank v. Fiske,* 71 N. Y., 353; 2 Kent's Com., 324, 620, 621; Edwards on Bailm., 217; Dunlap's Paley, 202, 207; *Covill v. Hill,* 4 Denio, 323. 4. The possession by Sampson, not being inconsistent with plaintiff's rights, which were shown by the paper itself, raises no estoppel against plaintiff, and gives defendants no rights. *Rowley v. Brown,* 71 N. Y., 85.

The cause was submitted for the respondent on the brief of *E. S. Bragg:*

Sampson was payee of the note, and no assignment with his signature, on the back thereof, could outweigh his possession. Delivery was a *sine qua non* to a valid transfer of the title, but a written assignment was not an absolute requisite. The purchaser from Sampson paid full value before he knew of the indorsement. He could not read English, but, as soon as he discovered that there was an indorsement, he made inquiry about it, and was informed that the note had been used as collateral and taken up again. The possession of Sampson supported this statement. Plaintiff clothed Sampson with apparent authority, and suffered him to impose upon an innocent purchaser. He cannot be permitted to recover against one who became a victim by his carelessness.

TAYLOR, J. On the part of the plaintiff it is insisted, that the evidence shows that the legal title to the *Bullis* and *Robbins* note was in the plaintiff at the time it was received by Weyer and the defendants; that he was entitled to hold the same as against them and all other persons until his note of $100, and the interest thereon, which he held against Sampson, was paid; and that the refusal of the said defendants to return the same to him on demand, or pay the amount of his note, was a conversion by the defendants. It is not denied on the part of the defendants, that they would be liable to the plaintiff for the amount of his debt, if, at the time they paid and took up their note, they knew that it had been assigned to the plaintiff by Sampson to secure the payment of such debt, and that such assignment had not been cancelled.

But it is insisted by the learned counsel for the respondents, that the possession of the note by the payee, notwithstanding the assignment by him indorsed on the back thereof, showing that it had been assigned to *Pier*, destroyed the effect of such

assignment, and that from such possession the law would raise a presumption of a reässignment to the payee. It is probable that the possession of the note by the payee after the assignment had been made, would be a fact which might properly be given in evidence upon the question of ownership; but that fact alone does not amount to even *prima facie* evidence that the title had been restored to the payee. We think the written assignment remaining uncancelled would be much stronger evidence of ownership than the mere possession of the payee.

To illustrate: suppose that *Bullis* and *Robbins* had sold Sampson a horse, and afterwards Sampson had sold the horse to *Pier*, of which fact *Bullis* and *Robbins* had full notice; and that afterwards *Pier* had delivered the horse to Sampson as his bailee for a temporary purpose, and whilst so in his possession they had bought the horse of him and paid him for it: could they claim that they were *bona fide* purchasers without notice of the rights of *Pier*, and that his title to the horse had therefore failed? Most certainly they could not. We think the case at bar presents a stronger case against the right of the defendants to insist that they should be protected because they purchased the property of a person who had once owned it, he being in the possession at the time of their purchase, notwithstanding they knew he had at one time not long before sold the same.

In this case, the purchaser from Sampson, when he placed the property purchased in his possession for a mere temporary purpose, placed with it, in such connection that it could not be severed, plain and ample evidence of his ownership. The property had plainly marked thereon, so as to be readily seen by any one dealing with the party in possession, the name of the real owner. The note with the assignment on the back, unexplained, was clear proof that the title had passed out of the payee, and consequently out of the party in possession. The defendants having refused to produce the note and assign-

ment, and having failed to give any proof in relation thereto, it must be presumed that the assignment on the back thereof, at the time they purchased it or took it up, was in the same condition as when it left the hands of the plaintiff — neither erased nor cancelled.

The evidence of the transfer of the title by the payee to a third party being perfect, his possession would be no more evidence of title in him than if found in the possession of some other party, and the possession by a third person would be just as much evidence that he had purchased the property of the assignee as the possession of the payee. In either case, in order to sustain the title of the party in possession, there must be proof of a purchase from the assignee, or proof showing that the assignment never took effect as such.

A stranger could make a good title, notwithstanding the assignment, by parol proof that he purchased the same of the assignee; but to sustain his title as against the rights of the assignee, he would either have to prove such purchase, or that the assignment for some reason had never operated to pass the title to the assignee; and it would take the same kind of proof to sustain the title of the payee against his own assignment.

It cannot justly be said that the plaintiff, by his delivery of the note to the payee under the circumstances detailed in the evidence, was guilty of any fault, or that he in any way clothed the payee with the evidences of ownership, and that he should therefore be estopped from asserting such ownership against a third person dealing with the payee. He was careful to send with the note his evidence of title and ownership, so attached to the note itself that no man of any business capacity could fail to discover it; and there must have been a want of ordinary care on the part of the person purchasing it, if he did not discover that the payee and possessor did not own it. It was no excuse for Mr. Weyer, if it be true, that he could not read the assignment, or did not see it. It was

where a man in the exercise of ordinary care would have seen it; and if he neglected to exercise such ordinary care in making the purchase, he, and not the plaintiff, must suffer for his neglect. The evidence given by the plaintiff tending to show that the defendants and their immediate vendor had or were charged with notice of the ownership of the note by the plaintiff, was ample to carry the case to the jury.

It is evident from what has been said, that it was error on the part of the court to direct a verdict for the defendants.

*By the Court.* — The judgment of the circuit court is reversed, and the cause remanded for a new trial.